UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
RAMI ABUZIYAD,

                          Petitioner,

          -against-                                      **REPORT AND
                                                        RECOMMENDATION**
PAUL M. GOYEA, Superintendent, Mohawk                   17 CV 552 (MKB)(CLP)
Correctional Facility,

                          Respondent.
---------------------------------------------------------X

**POLLAK**, United States Magistrate Judge:

On January 20, 2017, petitioner Rami Abuziyad, proceeding <u>pro se</u>, filed this Petition for

a writ of <u>habeas corpus</u>, pursuant to 28 U.S.C. § 2254, raising three claims.  (Pet.[1]).  On June 20,

2019, the Petition was referred to the undersigned to prepare a Report and Recommendation.

For the reasons set forth below, the Court respectfully recommends that the court deny

the Petition in its entirety.

<u>FACTUAL BACKGROUND</u>

The charges in this case center on stolen goods possessed by petitioner, found by law

enforcement officials from the New York City Police Department ("NYPD" or "Police

Department") on January 9, 2012.  The facts set forth below are derived from the testimony

presented during petitioner's trial, which commenced on September 10, 2012, in Kings County

Supreme Court.

---

[1] Citations to "Pet." refer to the Petition Under 28 U.S.C. § 2254 for a Writ of <u>Habeas Corpus</u> by a Person in State Custody, filed on January 30, 2017, ECF No. 1.

### A. Charlene Leonardi's Testimony

Charlene Leonardi testified as a witness for the prosecution. She testified that she owned 1658 64th Street for twelve years and knew petitioner as one of her of tenants. (Tr.[2] at 118). Ms. Leonardi testified that petitioner had moved into 1658 64th Street on October 15, 2011 with his wife. (Id. at 120). Ms. Leonardi testified that at some point after petitioner moved in, he asked to rent the rear of the basement for his weight lifting equipment. At the time he asked, the storage bins[3] in the basement were in use by an ex-tenant and the other owner of the building, who did not live there at the time. (Id. at 121). None of the other tenants had permission to go down to the rear of the basement. (Id. at 126). Ms. Leonardi testified that she had looked into the shed used by the other owner before renting the back basement to petitioner, and it only contained Christmas decorations. She also testified that none of the storage sheds were ever locked. (Id. at 122).

Ms. Leonardi testified that at the end of December of 2011, she observed petitioner constructing a wall without permission in the basement of 1658 64th Street. (Id. at 125, 127). She testified that she asked petitioner to remove the wall since it was blocking the thermometer and the fire door to the backyard, and therefore posed a fire hazard. (Id. at 126-27). She later clarified that he had built the wall, but she had only actually seen him attaching the door to the wall. (Id. at 127). When she asked him to remove the wall he responded, "[f]uck you." (Id. at

---

[2] Citations to "Tr." refer to the transcript of the trial proceedings before the state court, commencing on September 10, 2012, contained within the State Court Record, ECF No. 7.

[3] Throughout the trial testimony, the witnesses refer to structures in the basement of 1658 64th Street as both "bins" and "sheds." (See Tr.). It appears that the witnesses, when discussing both "bins" and "sheds," are using the terms interchangeably and are contemplating the same three "makeshift ... wooden storage sheds" discussed by Officer Than and Ms. Leonardi. (Id. at 43, 122). These structures are large enough to contain various household items and furniture. (Id. at 60, 121).

128).  She further testified that she asked him for a key to the door and he denied her one, saying that he and his wife had keys and if she ever needed to get in, they would open the door for her. (Id. at 129).

Ms. Leonardi testified that after this interaction, she reached out to a friend of hers who was employed by the Police Department and he connected her with Sergeant Berson in the 62nd Precinct.  (Id. at 129-30).  She testified that she met with Sergeant Berson, Officer Scali, and Officer Than at her property on January 9, 2012, and took them downstairs where they removed part of the wood from the makeshift wall and thus gained access to the portioned off area.  (Id. at 132-34).  There she saw a bed, a refrigerator, a flat screen television, a radio, miscellaneous wires, and the storage bins, now locked.  (Id. at 134-36).  She testified that she had only granted petitioner permission to use the rear basement for exercise equipment.  (Id. at 136).  She watched as the police removed the locks and opened the storage bins.  From the bin that had previously only contained Christmas decorations, the officers removed duffle bags, school bags, a ski mask, gloves, a flashlight, Chinese currency, jewelry, and laptops.  (Id. at 139-40).  According to the witness, the police officers then took these items to the police station.  (Id. at 140).

On cross examination, petitioner's counsel questioned Ms. Leonardi about the basement's various code violations.  (Id. at 141-46).  She testified that she had never seen petitioner with any of the items that she had seen the police remove from the storage shed.  (Id. at 149).  Defense counsel questioned Ms. Leonardi about the number of tenants who had access to the basement at least in part, and whether she knew the goings on of the building at all hours since she did not live there herself.  (Id. at 151-52).  She testified that she had not been in the rear of the basement for a month prior to the police coming to her property.  (Id. at 155).

B. <u>Police Officer David Than's Testimony</u>

At trial, Police Officer David Than testified as a witness for the prosecution. (Tr. at 37). He testified that on January 9, 2012, he and his partner Officer Scali were assigned to the Anti-Crime Unit at the 62nd Precinct. (<u>Id.</u> at 38). He testified that at approximately three o'clock, he received a call instructing him to go to 1658 64th Street. (<u>Id.</u> at 38). He arrived with Officer Scali and his supervisor, Sergeant Berson, where they met with Charlene Leonardi, the landlord and superintendent of 1658 64th Street. (<u>Id.</u> at 39). Officer Than testified that he, Officer Scali, Sergeant Berson, and Ms. Leonardi all went downstairs into the basement of 1658 64th Street. (<u>Id.</u> at 39-40). In the basement, he observed a weight training area, a laundry area, and a makeshift wall and door. (<u>Id.</u> at 40). On Ms. Leonardi's instruction, he began to take the makeshift wall down by unscrewing the plywood from the frame. (<u>Id.</u> at 40-41).

Officer Than testified that behind the makeshift wall he observed a weight lifting area, television, nightstand, bed, padlocked storage bins, and a large cement block containing a water heater or furnace. (<u>Id.</u> at 42-43). He removed the locks from the storage sheds at Ms. Leonardi's instruction. Inside the shed he observed a small table, a dresser, and a plastic storage container with a laptop on top. (<u>Id.</u> at 44). He removed work gloves, a school bag, a ski mask, cameras, jewelry, currency, and other laptops from within the storage shed. (<u>Id.</u> at 45-46). Officer Than and his partner then vouchered the ski mask and work gloves and sent them to the police laboratory. (<u>Id.</u> at 47-48). Officer Than testified that he then entered the serial number of the black HP laptop recovered in the storage shed into the Stolen Property Inquiry System ("SPIS") and was alerted to a stolen property report from New Jersey filed by Kelvin Garcia. (<u>Id.</u> at 49-51). He testified that he then opened the black HP laptop to see a Windows lock screen with the name "Rami" on it. (<u>Id.</u> at 51).

On cross examination, defense counsel noted that there was no photographic evidence of the makeshift wall, nor had the police officers verified that Ms. Leonardi was in fact the owner of 1658 64th Street before obeying her directives to remove the makeshift wall. (Id. at 72-74). Officer Than testified that he had not asked any of the other tenants in the building whether the property was theirs, nor had he checked any of the property found for petitioner's fingerprints. (Id. at 75-77). He further testified that none of the other computers recovered had the screen name "Rami," nor an Arabic keyboard. (Id. at 76). He testified that he had not questioned Ms. Leonardi nor any of the tenants in the building about whether they had ever seen petitioner with the stolen property. (Id. at 81).

On redirect, Officer Than testified that Ms. Leonardi told him that petitioner used the sheds for storage without her permission. (Id. at 83).

C. Sergeant Jeremy Berson

Sergeant Jeremy Berson also served as a witness for the prosecution. He testified that he received a phone call from a detective from the intelligence division who gave him Ms. Leonardi's information. (Id. at 213). He called her at the end of December or beginning of January and went to visit her at 1658 64th Street on January 9, 2012, with Officer Scali and Officer Than. (Id. at 214). He testified that on that day, he and his partners went into the basement of 1658 64th Street and observed a plywood wall and, on Ms. Leonardi's instruction, removed some of the plywood in order to gain access to the rear of the basement. (Id. at 214-15). In the rear of the basement he observed a bed, television, refrigerator, weight bench and other exercise equipment, and a wooden storage shed. (Id. at 216). Again, at Ms. Leonardi's instruction, they opened up the shed and observed laptops, cameras, jewelry, cash, foreign currency, a ski mask, gloves, and other miscellaneous items. (Id.)

On cross examination, Sergeant Berson testified that there was a lock on the makeshift door when he visited 1658 64th Street. He was questioned on the exact location of the ski mask, to which Sergeant Berson answered he could not remember, but it was either in a plastic bin or a knapsack. He testified that the work gloves were found in a plastic bag with the ski mask. (Id. at 217).

### D. Police Officer Michael Scali

Officer Michael Scali also served as a witness for the prosecution. He testified that on January 9, 2012, at around 3:30 p.m., he was called to 1658 64th Street. (Id. at 219). Based on the instruction of Ms. Leonardi, he pried open part of the makeshift wall in the basement of 1658 64th Street in order to gain access to the back room. (Id. at 220-21). In the back room, he observed a bed, dresser, television, and a shed with three locks. (Id. at 221-22). He testified that he and his team removed the locks from the shed and observed a dresser, numerous electronics, and some jewelry. (Id. at 222-23). He, Officer Than, and Sergeant Berson removed the property in the shed and placed it on the bed. Officer Scali testified that the ski mask and gloves were found inside a bag in the dresser. (Id. at 223). In addition, he removed laptops, jewelry, and foreign currency from the shed. He took these items back to the precinct and used the Omniform system to see whether any complaint reports matched the property. (Id. at 224). He testified that he found matches for stolen property complaint reports from Brooklyn, Queens, and New Jersey. (Id. at 225). Officer Scali then contacted each of the individuals who filed these complaint reports and met with them to return their stolen goods. (Id. at 226). All of the items Officer Scali brought back to the precinct were found in the shed. (Id. at 227).

On cross examination, Officer Scali testified that he could not remember where in the shed the gloves and mask were found, and that to his knowledge there was no photograph taken

of the shed before any of the property was removed. In addition, Officer Scali testified that, to his knowledge, there were no photographs taken of the gloves and mask at the location within the shed in which they were found. (Id. at 233-34).

E. Ting Qui's Testimony

Ting Qui also served as a witness for the prosecution. She testified that on November 25, 2011, someone broke into her home where she lived with her family and stole her laptop, several iPhones, jewelry, a Movado watch, and cash. (Id. at 169-70). She testified that in February of the following year, her brother had gone to the police precinct and recovered several of the stolen items, including two laptops, one Sony laptop bought in 2011 for around seven hundred dollars, and one HP laptop bought for around three hundred dollars. (Id. at 172-76). He also recovered one iPhone 4S, costing around seven hundred dollars; a digital camera, bought for one hundred and fifty dollars; and a Movado watch, which cost around eight hundred dollars. (Id.) Her brother was able to log in to the laptops as their passwords had not been changed. (Id. at 174). She testified that she did not know petitioner, nor had she ever given him permission to possess her family's property. (Id. at 177).

F. Megumi Tanaka's Testimony

Megumi Tanaka also testified as a witness for the prosecution. She testified that her home in Astoria, Queens, which she shared with roommate Megumi Seki, was broken into on December 23, 2011. (Id. at 86-87). She testified that her Asus laptop, camera, Japanese cell phone, and electronic dictionary were missing, along with her roommate's laptop, DVD recorder, and DVD player. (Id. at 87-88). About two weeks after the incident, Ms. Tanaka and her roommate went to a precinct in Brooklyn and identified her laptop and electronic dictionary, as well as her roommate's laptop and DVD player. (Id. at 88-89). She recognized the Asus laptop,

which she had bought in August 2011 for nine hundred dollars, because of a sticker on the computer. (Id. at 89). She also recognized the electronic dictionary, which she had purchased for about three hundred dollars. (Id. at 90). She testified that she did not know petitioner. (Id. at 91). On cross examination, she testified that she did not have any of the receipts related to the relevant property with her. (Id. at 91).

G. Mai Qiong Fan's Testimony

Mai Qiong Fan testified as a witness for the prosecution. She testified that her home in Bensonhurst, Brooklyn, where she lived with her brother and parents, was broken into on December 23, 2011. (Id. at 93). Several items were stolen from her house, including electronics, such as an Apple Macbook Pro bought two years earlier for thirteen hundred dollars and a Canon Powershot camera purchased for one hundred twenty dollars. (Id. at 94-98). Also taken at the time was some jewelry, including pearl necklaces and watches worth approximately four hundred dollars; and cash, including the equivalent of seven hundred American dollars in Chinese currency and fifty U.S. dollars in American coins. (Id.) About three weeks after the robbery, Ms. Fan went to the precinct in her neighborhood and recovered several items which had been stolen, including a navy Jansport backpack, which she had not previously realized was missing. (Id. at 95-96). Ms. Fan recognized her Macbook Pro at the precinct due to the screensaver as well as some of the documents saved onto the computer. (Id. at 98). She testified that she did not know petitioner, nor had she given him permission to possess any of her property. (Id. at 100). On cross examination, Ms. Fan testified that she did not have any receipts for the stolen property. (Id. at 100-01).

H. Triston Garcia's Testimony

Triston Garcia also served as a witness for the prosecution. Mr. Garcia testified that on

December 19, 2010, his home in Newark, New Jersey was broken into. (Id. at 193). He testified that an HP laptop he had bought a month before for one hundred and ninety-nine dollars was stolen. (Id. at 194, 196). In his police report he included the serial number for his laptop, which he had copied off of the back of the laptop's original box. (Id. at 195). When he went to the precinct, he recognized his HP laptop from the serial number. However, he was unable to log in because the keyboard had been changed to Arabic and the username had been altered. (Id. at 196-97). He testified that he did not recognize petitioner, nor had he ever given petitioner permission to possess his computer. (Id. at 197-98).

I.   Detective Donna Garrison's Testimony

Detective Donna Garrison testified as a witness for the prosecution. She was qualified by the court as an expert in the field of forensic digital examination. (Id. at 110). She testified that she replaced Detective Waldo Gonzalez on the case on June 28, 2012, and her charge was to examine an HP laptop. She did not complete the routine steps of noting the laptop's identifying features, such as the model number, nor did she upload the hard drive to the police server. (Id. at 112). Detective Garrison testified that a new operating system had been uploaded onto the HP laptop on December 9, 2011, with the username "Rami." (Id. at 114).

J.   Jennifer Lobasso's Testimony

Jennifer Lobasso testified as a witness for the prosecution. Ms. Lobasso testified that on December 23, 2011, her home in Bensonhurst, Brooklyn was broken into. (Id. at 204-05). Laptops, iPods, cash, Christmas gifts, a Samsung Galaxy, and a Gucci bag were all stolen. (Id. at 205). She only recovered from the police her Samsung Galaxy, purchased for about three hundred dollars, and an HP laptop, which cost seven or eight hundred dollars. (Id. at 206-07). She recognized her laptop due to the stickers and the screensaver, which was a photograph of her

9

son's eyes. She recognized the Galaxy tablet by two scratches and a pink stain on the back. (Id. at 208). She testified that she did not recognize petitioner, nor had she ever given petitioner permission to possess her property. (Id. at 210).

### K. Detective John Papio's Testimony

Detective John Papio served as a witness for the prosecution. He testified that he knew the petitioner because he had taken a DNA exemplar from him. He explained that a DNA exemplar is taken by rubbing a Q-tip swab on the inside of the mouth. This swab was then vouchered and sent to the NYPD laboratory and the medical examiner's office. (Id. at 191-92).

### L. Kristen Smith's Testimony

Kristen Smith testified that she is a level two criminalist at the New York City Office of Chief Medical Examiner ("OCME") in the Forensic Biology Department, an accredited laboratory. (Id. at 245-46). She testified that she had performed thousands of DNA analyses and comparisons in her career and had testified in over fifty-five grand juries and nineteen trials. (Id. at 247-48). She was qualified by the court as an expert in the field of forensic biology and DNA analysis.

Ms. Smith testified that she was the interpreting analyst for this case; she used the data in the case file to determine the DNA profile and write the DNA report. She then performed the comparisons between two DNA reports. She did not perform the preliminary DNA collection steps. (Id. at 253-54).

Ms. Smith testified that the OCME received two black ski masks and several gloves from Officer Than. (Id. at 257-58). Although both ski masks underwent DNA testing, only mask 1A had enough DNA to create a full profile. The gloves did not undergo DNA testing. (Id. at 258, 260). The masks were scraped by a level one criminalist, not Ms. Smith, to isolate the top layer

of fabric. They were then tested to produce the raw DNA information. The cells found on the masks then underwent quantitation, a process which estimates how much DNA has been collected. The DNA was then amplified to isolate the strands needed to complete the DNA profile. These strands were then fed into a DNA typing instrument which produces a DNA profile. The aforementioned steps were completed by level one criminalists who did not testify at trial. (Id. at 252-53, 259-60).

The raw data in the DNA profile was analyzed and interpreted by Ms. Smith; she used the results to match the DNA profile with an individual and determined that this DNA string would be found in fewer than one in 6.8 trillion people. (Id. at 260-61). This DNA profile was then compared with the DNA profile that Ms. Smith created from the raw data produced by DNA testing of an oral swab from petitioner. (Id. at 261-64). Ms. Smith testified that, in her expert opinion, it was petitioner's DNA on ski mask 1A. (Id. at 269-70). The two DNA profile reports and the DNA comparison chart were entered into evidence by the court with no objection by defense counsel. (Id. at 256, 265).

M. Carlos Padillo's Testimony

Carlos Padillo served as a witness for the prosecution. He testified that he lived with his cousin, Gerzel Rivera, at 1658 64th Street, and had known petitioner for about a year. (Id. at 178). He saw petitioner in the hallway and sometimes the basement, which he frequented as he was the part-time handyman for the building. (Id. at 180-81). He testified that he had seen petitioner building the makeshift wall at the end of December, and that he heard petitioner and Ms. Leonardi discussing the wall. He was aware that there were storage bins in the rear portion on the basement and testified that he never kept any of his property in said bins. (Id. at 181-82).

On cross examination, Mr. Padillo testified that the basement was available for anyone

living in the building to use and that individuals who were not residents of the building used the basement. (Id. at 183-84). He testified that Ms. Leonardi had not asked him to remove the wall and that initially there was no lock on the makeshift door. (Id. at 184). Petitioner's counsel asked if there was anyone living in the basement in 2011, to which Mr. Padillo answered yes, but never petitioner. (Id. at 185).

On redirect, Mr. Padillo clarified that the people living in the basement had begun residing there after petitioner had moved out of the building. (Id. at 188). He was also questioned about an instance in which his cousin needed to enter the rear area of the basement and whether she was able to gain access. He testified that she was unable to do so. (Id.)

On re-cross, Mr. Padillo clarified that he did not know whether his cousin ever got the key to the rear of the basement from petitioner, and therefore had no knowledge of whether petitioner actually had the key. (Id. at 189).

N.  Muhammed Alam Gir's Testimony

Muhammed Alam Gir served as a witness for the defense. He testified that he had lived at 1658 64th Street for almost three years and did store some belongings in the basement of the building. (Id. at 286). He further testified that others kept belongings in the basement as well. (Id. at 287). Mr. Gir also stated that he had seen non-tenants in the basement, smoking, drinking, and making lots of noise. (Id. at 289).

On cross examination, Mr. Gir clarified that he had only seen non-tenants in the basement after petitioner was arrested. (Id. at 292). On redirect, Mr. Gir testified that he had seen non-tenants drinking and smoking in the basement after Ms. Leonardi's husband had passed away, which was three years ago. (Id. at 295).

Petitioner did not testify at his trial.

12

## PROCEDURAL BACKGROUND

### A. The Indictment

Following his arrest on February 1, 2012, petitioner was indicted in Kings County and charged with two counts of Criminal Possession of Stolen Property in the Third Degree, in violation of N.Y. Penal Law § 165.50, six counts of Criminal Possession of Stolen Property in the Fourth Degree, in violation of N.Y. Penal Law § 165.45, and six counts of Criminal Possession of Stolen Property in the Fifth Degree, in violation of N.Y. Penal Law § 165.40. (Twersky Aff.[4] ¶ 4).

### B. The Sandoval Hearing

The court conducted a hearing pursuant to People v. Sandoval, 34 N.Y.2d 371, 314 N.E.2d 413 (1974), to determine if the prosecution would be allowed to introduce petitioner's prior conviction of criminal possession of stolen property in the third degree into evidence. The trial court judge ruled that if petitioner took the stand, the prosecution could question him about his prior conviction and the underlying facts found in petitioner's plea agreement in order to challenge petitioner's credibility. Trial counsel did not object to this ruling. (Tr. at 6-7).

### C. The Trial

Petitioner's trial commenced before the Honorable Wayne Ozzi in Kings County Supreme Court on September 10, 2012. On September 24, 2012, the jury returned a verdict of guilty on one count of Criminal Possession of Stolen Property in the Third Degree. (Twersky Aff. ¶ 5).

---

[4] Citations to "Twersky Aff." refer to the Affidavit of Sholom J. Twersky in Opposition to Petition for Writ of Habeas Corpus, dated April 4, 2017, ECF No. 5.

D. Petitioner's Section 440.10 Motion and Sentence

On November 1, 2012, petitioner's counsel filed a motion seeking to vacate the judgment pursuant to Criminal Procedure Law Section 440.10, alleging that the prosecution relied on fraudulent testimony. (See Tr. at 552-53). On November 15, 2012, the trial court denied petitioner's 440.10 Motion to Vacate Judgment, and sentenced petitioner to an indeterminate prison term of three to six years. (Id. at 553, 561).

E. The Direct Appeal

In April 2015, petitioner filed a direct appeal from the judgment of conviction through his attorney Shane Tela, raising two distinct issues: 1) the trial court's Sandoval ruling denied petitioner his right to a fair trial because, without reviewing the plea minutes themselves, the court allowed the People to elicit the underlying facts found in the plea proceedings of the petitioner's prior felony conviction of Criminal Possession of Stolen Property in the Third Degree if petitioner took the stand, thus discouraging petitioner from testifying; and 2) the trial court's admission of two DNA profile reports and a DNA comparison chart violated the petitioner's right of confrontation as the OCME employee who testified did not complete the DNA profile reports and, to the extent that the issue was unpreserved, trial counsel was ineffective for failing to preserve the error. (Twersky Aff. ¶ 7; see also Appeal Br.[5] 21-27, 27-37).

On February 10, 2016, the Appellate Division, Second Department, unanimously affirmed the trial court's judgment. See People v. Abuziyad, 136 A.D.3d 837, 24 N.Y.S.3d 516 (2d Dep't 2016). The Appellate Division held that petitioner's challenge to the Sandoval ruling

---

[5] Citations to "Appeal Br." refer to the Brief for Defendant-Appellant, dated April 2015, and labeled Defendant's Appellate Brief, ECF No. 5.

14

was only partially preserved for appellate review and "in any event, [] without merit." Id.

Further, the Appellate Division held that petitioner had failed to preserve the Confrontation

Clause issue for appellate review. The court went on to explain that the claim was nonetheless

without merit, as the two DNA profile reports were not "testimonial in nature because they

consisted of merely raw data that, standing alone, did not link the [petitioner] to the crime." Id.

(internal citations and quotations omitted). The Appellate Division found that the defense

counsel's failure to object to the admission of the DNA profile reports and comparison chart did

not constitute ineffective assistance of counsel. Id.

On June 13, 2016, petitioner's application to appeal to the Court of Appeals was denied.

People v. Abuziyad, 27 N.Y.3d 1127, 61 N.E.3d 508 (2016).

F.   The Habeas Corpus Petition

On January 20, 2017, petitioner, proceeding pro se, filed his Petition for a writ of habeas

corpus in this Court. (See Pet.). The petition raised three claims: 1) that petitioner's due process

right to a fair trial was violated when the trial court, through a Sandoval ruling, allowed the

prosecution to elicit the underlying facts of petitioner's previous felony conviction if he took the

stand, thus discouraging him from testifying; 2) that petitioner's confrontation rights were

violated when the trial court admitted two DNA profile reports which had been prepared by

OCME employees who did not testify; and 3) that material evidence adduced at trial resulting in

the judgment was false, and, prior to the entry of the judgment, was known to the prosecutor to

be false and in violation of petitioner's right to a fair trial. (Id.)

On April 4, 2017, respondent submitted a Memorandum of Law in Opposition to Petition

for a Writ of Habeas Corpus, urging the Court to deny the Petition in its entirety because the

claims are procedurally barred and without merit. (See Mem.[6]). Petitioner filed a Reply in Opposition on May 1, 2017. (See Reply[7]). On June 20, 2019, the petition was referred to the undersigned to prepare a Report and Recommendation.

G. The Court's July 15, 2019 Order

On July 15, 2019, the Court ordered respondent to provide information regarding petitioner's prior conviction and any immigration proceedings which may have occurred thereafter. (See July Order[8]). On July 22, 2019, the State responded with some preliminary information regarding the Court's queries (see Twersky Mot.[9]), and on July 25, 2019, the State submitted a letter with the remaining information. (See Twersky Letter[10]). Respondent reported that on May 21, 2010, petitioner had previously been sentenced to a term of two to six years imprisonment, as a result of his plea of guilty on May 7, 2010, to Criminal Possession of Stolen Property in the Third Degree. (Twersky Mot.). Thereafter, on September 22, 2010, the United States Department of Homeland Security ("DHS") served petitioner with a Notice to Appear at a removal proceeding. On January 13, 2011, DHS served petitioner with an amended Notice to Appear. On September 25, 2018, an Immigration Judge issued a removal order, ordering petitioner removed from the United States, because he had overstayed his B2 visa since 2005, and based on his May 21, 2010, conviction of Criminal Possession of Stolen Property in the

---

[6] Citations to "Mem." refer to the respondent's Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus, attached as Exhibit to the Affidavit of Sholom Twersky in Opposition to Petition for Writ of Habeas Corpus, dated April 4, 2017, ECF No. 5.

[7] Citations to "Reply" refer to the petitioner's Reply in Opposition to Respondent's Opposition to Petition for Writ of Habeas Corpus, dated April 27, 2017, ECF No. 6.

[8] Citations to "July Order" refer to the Court's Order dated July 15, 2019, ECF No. 8.

[9] Citations to "Twersky Mot." refer to the First Motion for Extension of Time to File Answer to Court's 7/15/19 Order, filed on July 22, 2019, ECF No. 9.

[10] Citations to "Twersky Letter" refer to respondent's Letter Further Responding to July 15, 2019 Order, dated July 25, 2019, ECF No. 11.

Third Degree.  According to DHS, petitioner is currently on supervised release while arrangements are being made for his removal from the country.  (Twersky Letter at 1).

## DISCUSSION

I.     Timeliness of Petition

This habeas Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (codified as amended in scattered sections of the United States Code), which provides that a "1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1).  This limitation, absent certain exceptions that do not apply to this case, runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  A conviction is deemed final for AEDPA purposes when the defendant's time to seek certiorari before the United States Supreme Court has expired.  See Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001).[11]  Moreover, any "time during which a properly filed application for State post-conviction or other collateral review . . . is pending" is excluded from the calculation of the statute of limitations period.  28 U.S.C. § 2244(d)(2).

The Appellate Division upheld petitioner's conviction on February 10, 2016, see People v. Abuziyad, 136 A.D.3d 837, and petitioner's application for leave to appeal to the Court of Appeals was denied on June 13, 2016.  See People v. Abuziyad, 27 N.Y.3d 1127.  Under Rule 13 of the Rules of the Supreme Court of the United States, petitioner's conviction became final 90

---

[11] If the defendant files a petition with the United States Supreme Court, the conviction is final when certiorari proceedings have concluded.  Williams v. Artuz, 237 F.3d at 151.

days after petitioner's motion for leave to appeal to the Court of Appeals was denied, on September 11, 2016.[12]

Thus, the statute of limitations applicable to petitioner's habeas Petition would have expired on September 11, 2017, one year after the period for petitioner to seek Supreme Court review expired. Petitioner filed a pro se application for a federal writ of habeas corpus on January 20, 2017. Thus, petitioner's claim is timely.

## II. Mootness

A federal court may only consider a petition for a writ of habeas corpus under 28 U.S.C. § 2241 filed by prisoners "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). However, "actual, physical custody" is not required to satisfy the "in custody" requirement. Vega v. Schneiderman, 861 F.3d 72, 73 (2d Cir. 2017) (citing Jones v. Cunningham, 371 U.S. 236, 239-40 (1963)). Rather, a petitioner may satisfy this requirement if he "is subject to a significant restraint upon [his] liberty 'not shared by the public generally.'" Id. (quoting Jones v. Cunningham, 371 U.S. at 240). The focus is on "the 'severity' of an actual or potential restraint on liberty." Id. (quoting Poodry v. Towanda Band of Seneca Indians, 85 F.3d 874, 894-95 (2d Cir. 1996)).

Where, as here, the petitioner has served his sentence of incarceration, there must be some collateral consequence of the conviction, some concrete and continuing injury, or the petition will be considered moot. See Spencer v. Kemna, 118 U.S. 1978 (1998) (holding that "[o]nce the convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole – some collateral consequence of the conviction –

---

[12]A petition for a writ of certiorari is timely when filed within 90 days after entry of judgment of a state court of last resort or a United States court of appeals. Sup. Ct. R. 13. Petitioner did not seek such relief.

must exist if the suit is to be maintained") (internal citations and quotations omitted).  An inability to enter the United States without permission of the United States Attorney General because of an order of deportation is a "collateral consequence" that would justify review of petitioner's claims.  See 8 U.S.C. § 1182(a)(9)(A)(ii)-(iii); see also Doumbia v. New York Dept. of Civil Services, No. 11 CV 7677, 2015 WL 3619536 (S.D.N.Y. June 9, 2015); Miller v. Rabsatt, No. 10 CV 3687, 2014 WL 7336456 (S.D.N.Y. Dec. 24, 2014).

An individual who is not a citizen of the United States may have an order of deportation entered if he is convicted of an aggravated felony.  See 8 U.S.C. § 1227(a)(2)(A)(iii) (stating that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable").  Under the Immigration and Nationality Act (INA), an aggravated felony is defined by an extensive list of offenses, including a "theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year."  8 U.S.C. § 1101(a)(43)(G).  Once an individual is convicted of an aggravated felony, he becomes "deportable," even if he is not immediately deported.

Courts in this circuit have noted that a habeas petitioner must face the collateral consequence of deportation from the conviction which he seeks to challenge in order for the habeas petition to survive a challenge on mootness grounds.  See Perez v. Greiner, 296 F.3d 123, 126 (2d Cir. 2002) (holding that "[b]ecause Perez is permanently barred from this country on a wholly separate ground, the currently challenged robbery conviction can have no meaningful effect on his admissibility and hence cannot serve as a possible collateral consequence"); see also De La Rosa v. Ebert, No. 03 CV 9820, 2005 WL 525650 at *9-10 (S.D.N.Y. Mar. 4, 2005) (stating:  "Even if this Court reversed his 1990 conviction, his 1992 conviction would remain,

effectively barring him from entering the United States. Therefore, I find that De la Rosa's petition does not meet the case-or-controversy requirement. . .").

Prior to the conviction at issue in this Petition, petitioner previously pled guilty on May 7, 2010 to criminal possession of stolen goods in the third degree. (Twersky Mot.). In response to the Court's July 15, 2019 Order, respondent informed the Court that petitioner was sentenced to two to six years imprisonment in conjunction with this 2010 conviction. Criminal possession of stolen goods in the third degree is designated as an aggravated felony under the INA if the term of imprisonment following the conviction is at least one year. See 8 U.S.C. § 1101(a)(43)(G) (defining aggravated felony as "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year"); see also 8 U.S.C. § 1227(a)(2)(A)(iii). Since petitioner was previously convicted upon a plea of guilty for criminal possession of stolen goods in the third degree in 2010 and was sentenced to more than one year of incarceration (see Twersky Letter), the Court concludes that petitioner became deportable in 2010. See 8 U.S.C. § 1227(a)(2)(A)(iii); 8 U.S.C. § 1127(a)(2)(B)(i); see also Dawkins v. Holder, 762 F.3d 267 (2d Cir. 2014) (holding that appellant could be deported based on conviction of an aggravated felony theft offense as defined in the INA). Petitioner was in the United States in February 2012, when he was arrested again, for the crime at issue in his Petition.

The only way that petitioner's 2010 conviction would not render the instant Petition moot is if petitioner had previously been granted a waiver for his 2010 conviction. If petitioner were previously granted a deportation waiver, then the 2010 conviction would not have led to his deportation from the United States. In the event of a waiver, petitioner would not be refused entry to the United States based on his 2010 conviction; the 2012 conviction at issue in his Petition would be the sole ground for refusal of entry. Any action taken by the Court to grant

this current petition would therefore address the collateral consequence of petitioner's conviction and render the case at hand not moot.  See Mitchell v. People of New York, No. 03 CV 3303, 2007 WL 3355550 at *9 (S.D.N.Y. Sep. 12, 2007) (holding that "[g]iven that [petitioner's] 1995 conviction may have been waived for immigration purposes by 212(c), the [Immigration Judge] should not have considered it during his 2003 removal hearing, except in conjunction with the 1997 conviction for having committed two [crimes of moral turpitude]. [Petitioner's] removal order should have been based on the conviction at issue here, and Mitchell therefore faces collateral consequences arising out of the conviction at issue in the instant petition").

However, in this case, petitioner did not receive any sort of waiver of removal in 2010. In fact, there is an order of removal against petitioner, issued on September 25, 2018, as a result of petitioner's May 21, 2010 conviction.  (Twersky Letter at 1).  Thus, even if the habeas Petition were granted and the 2012 conviction were overturned, the evidence in the record before this Court suggests that petitioner would still be refused entry to the United States based on his 2010 conviction on aggravated felony charges.  Since any action taken by the Court on this petition would not address the collateral consequence of petitioner's earlier conviction and order of removal, the case at hand is moot.  See Perez v. Greiner, 296 F.3d 123 (2d Cir. 2002); Doumbia v. New York Dept. of Civil Services, No. 11 CV 7677, 2015 WL 3619536 (S.D.N.Y. June 9, 2015); Miller v. Rabsatt, No. 10 CV 3687, 2014 WL 7336456 (S.D.N.Y. Dec. 24, 2014); Garcia v. Woughter, No. 09 CV 7722, 2011 WL 5519899 (S.D.N.Y. Nov. 14, 2011); De La Rosa v. Ebert, No. 03 CV 9820, 2005 WL 525650 (S.D.N.Y. Mar. 4, 2005).

Accordingly, the Court respectfully recommends that the petition be dismissed as moot. However, if the petition is found not to be moot, the Court has assessed the merits of petitioner's claims and found that the claims do not warrant habeas relief.

III.    AEDPA Standards

Under 28 U.S.C. § 2254, as amended by AEDPA, the authority of federal courts to grant writs of habeas corpus on the merits of claims filed by state prisoners is limited to instances in which it can be shown that the adjudication of a claim on the merits in state court:  (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In Williams v. Taylor, the Supreme Court indicated that the "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) have independent meanings.  529 U.S. 362, 404-05 (2000).  Under the first prong, a state court decision is considered to be "contrary to" clearly established federal law where the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or where the state court "confronts a set of facts that are materially indistinguishable" from those considered by the Supreme Court, but "nevertheless arrives at a result different from [Supreme Court] precedent."  Id. at 405-06; accord Evans v. Fischer, 712 F.3d 125, 132–33 (2d Cir. 2013); King v. Greiner, 453 F. App'x 88, 89 (2d Cir. 2011).  The precedent providing guidance in this analysis are "the holdings, as opposed to . . . dicta" of the Supreme Court's decisions at the time of the state court decision. Contreras v. Artus, 778 F.3d 97, 110 (2d Cir. 2015) (quoting Williams v. Taylor, 529 U.S. at 412).

Under the "unreasonable application" prong of Section 2254(d)(1), a state court decision will be set aside if it involves an "unreasonable application" of the correct governing legal rule to the particular facts of the case, see Williams v. Taylor, 529 U.S. at 407, 409; King v. Greiner,

453 F. App'x at 89; Evans v. Fischer, 712 F.3d at 133, or if the decision "refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." Emmons v. Artus, 494 F. App'x 127, 128 (2d Cir. 2012) (quoting Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006)).  In conducting this analysis, the appropriate inquiry is whether the decision was objectively unreasonable, not merely whether it was incorrect or erroneous.  Williams v. Taylor, 529 U.S. at 409-11.

     The Supreme Court has made it clear that review under Section 2254(d) is extremely narrow.  The Court has stated that habeas corpus is "'a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.'" Woods v. Donald, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (quoting Harrington v. Richter, 562 U.S. 86, 102-03 (2011)).  A habeas court must first determine the theories that formed the basis of the state court's decision, then ask whether "fairminded jurists could disagree" that those theories were inconsistent with a prior Supreme Court decision.  Harrington v. Richter, 562 U.S. at 101.  A habeas petitioner must show that the state court's ruling was "so lacking in justification" that there was an error in existing law that is "beyond any possibility for fairminded disagreement."  Id. at 103.  This standard is intentionally difficult to meet.[13]  Id. at 102.

     Under AEDPA, a state court's determination of a factual issue is "presumed to be correct," 28 U.S.C. § 2254(e)(1); Sarcina v. Artus, 452 F. App'x 44, 46 (2d Cir. 2011), and the petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Moreover, "a decision adjudicated on the merits in a state

---

[13] See Cameron v. Smith, No. 11 CV 5100, 2011 WL 6708790 at *3 (E.D.N.Y. Dec. 21, 2011) (holding that "[t]his standard . . . is arguably the narrowest standard of judicial review in the law").

court and based on a *factual* determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(d)(2)) (emphasis added).

IV.    Exhaustion of Petitioner's Claims

Before considering the merits of each of petitioner's claims, this Court must first determine if petitioner has exhausted all available state remedies and whether federal habeas review is permissible.

A federal court may not grant a petition for a writ of habeas corpus unless a petitioner has exhausted all available state court remedies. See 28 U.S.C. § 2254(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275-76 (1971); Richardson v. Superintendent of Mid-Orange Corr. Facility, 621 F.3d 196, 201 (2d Cir. 2010); Galdamez v. Keane, 394 F.3d 68, 72 (2d Cir. 2005); Aparicio v. Artuz, 269 F.3d 78, 89 (2d Cir. 2001); Vittor v. New York State Dep't of Corr. and Cmty. Supervision, No. 13 CV 3112, 2014 WL 1922835, at *3 (E.D.N.Y. May 14, 2014). This rule, based on principles of comity between state and federal courts, requires that the state have "the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991); accord Picard v. Connor, 404 U.S. at 275-76. "To fulfill the exhaustion requirement, a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.'" Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) (quoting Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990)), cert. denied, 115 S. Ct. 1436 (1995)). "'In order to have fairly presented his federal claim to the state courts[,] the petitioner must have informed the state court of both the factual and the legal premises of the

claim he asserts in federal court.'" Rush v. Lempke, 500 F. App'x 12, 14 (2d Cir. 2012) (quoting

Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir. 1982) (en banc)).

A habeas petitioner satisfies the exhaustion requirement if he has presented his claim to

the appropriate state courts in accordance with state procedural requirements, and has thereby

"afford[ed] the state courts a meaningful opportunity to consider [the] allegations of legal error."

Vasquez v. Hillery, 474 U.S. 254, 257 (1986) (citations omitted).  Although some courts have

insisted upon citation in the state pleadings to a specific clause of the Federal Constitution that is

alleged to have been violated, courts in this Circuit have held that a claim may be "fairly

present[ed] to the state courts . . . without citing chapter and verse of the Constitution" if there is:

"(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state

cases employing constitutional analysis [in factually similar circumstances], (c) assertion of the

claim in terms so particular as to call to mind a specific right protected by the Constitution, and

(d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation."

Daye v. Attorney Gen. of State of New York, 696 F.2d at 194; accord Carvajal v. Artus, 663

F.3d 95, 104 (2d Cir.), cert. denied, 132 S. Ct. 265 (2011); Jones v. Vacco, 126 F.3d 408, 413-14

(2d Cir. 1997) (holding that "[c]it[ation to] a specific constitutional provision or rel[iance] on

federal constitutional precedents alerts state courts of the nature of the claim"); Williams v. Lord,

996 F.2d 1481, 1483 (2d Cir. 1993) (holding that petitioner had fully presented her claim to the

state court where, "[a]lthough she did not cite specific constitutional provisions in her [state

court] brief[,] . . . she explicitly asserted her constitutional right to present a defense . . . [and]

cited a leading Supreme Court case in this area"), cert. denied, 510 U.S. 1120 (1994).

The legal claims raised in the state courts must also be the "substantial equivalent" of the

claims raised in the federal petition.  See Picard v. Connor, 404 U.S. at 278; accord Jones v.

Murphy, 694 F.3d 225, 247 (2d Cir. 2012); Waterhouse v. Rodriguez, 848 F.2d 375, 381 (2d Cir. 1988) (noting that "[t]he legal theory relied upon in the federal court need not . . . be identical to the legal theory presented to the state courts, provided that the essential factual allegations and the ultimate constitutional question raised in the federal petition were presented to the state courts"). Once a federal claim has been properly presented to the state courts, the claim is considered exhausted even if the state court did not address the claim on the merits and instead rejected it on a state procedural ground, or did not rule on the claim on either substantive or procedural grounds, but nonetheless had a fair opportunity to address the claim. See, e.g., Coleman v. Thompson, 501 U.S. at 731-32.

Two of the three claims found in petitioner's habeas Petition were raised in his direct appeal to the Appellate Division. He then applied for leave to appeal to the Court of Appeals; his request was denied on June 13, 2016. Thus, these two claims were exhausted.

His third claim was raised five weeks after trial in a Motion to Vacate Judgment, pursuant to Section 440.10 of New York Criminal Procedure Law. Justice Ozzi denied this motion at petitioner's sentencing, on November 15, 2012. (See Tr. at 553). Petitioner did not apply for leave to appeal this decision to the Appellate Division. Nor did he raise the issue in the direct appeal, which was subsequently filed on April 21, 2015. Thus, as the claim outlined in petitioner's Section 440 Motion to Vacate has not been presented to "'to the highest court of the pertinent state,'" Bossett v. Walker, 41 F.3d 825, at 828 (quoting Pesina v. Johnson, 913 F.2d 53 at 54), this claim has not been exhausted.

It is well established that petitioner must exhaust all state remedies before a federal court may address a claim raised in a habeas petition. See, e.g., 28 U.S.C. § 2254(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275-76 (1971). To satisfy the exhaustion requirement, a petitioner must

present his or her federal claim to each appropriate state court, including the highest state court capable of reviewing such claim.  Orr v. Hulihan, No. 11 CV 501, 2012 U.S. Dist. LEXIS 90122, at *32 (S.D.N.Y. Jan 23, 2012).  A 1996 amendment to AEDPA, however, has created an exception to the total exhaustion rule, and allows a district court to "deny an entire habeas petition on the merits notwithstanding a petitioner's failure to exhaust some or all of his claims." Devaughn v. Graham, No. 14 CV 2322, 2017 WL 244837, at *4 (E.D.N.Y. Jan 19, 2017); see also 28 U.S.C. § 2254(b)(2); Pratt v. Greiner, 306 F.3d 1190, 1197 (2d Cir. 2002) (holding that: "[a] district court [may] deny a petition on the merits even if it contains an unexhausted claim"); Morrison v. Brown, No. 11 CV 3366, 2019 LEXIS 9311, at *12 (E.D.N.Y. Jan. 18, 2019) (holding that: "If a petitioner includes both exhausted and unexhausted claims in his petition, a district court may allow the petitioner to return to state court to exhaust his claims, amend and resubmit the petition to include only exhausted claims, or deny the petition on the merits").  The Court has therefore reviewed the merits of the third claim, discussed infra at 34-36.

V.    Procedural Default

As a separate and distinct issue, the Court must also address whether there was a procedural default with respect to any of the claims in the state proceedings.  See Engle v. Isaac, 456 U.S. 107, 129 (1982); Francis v. Henderson, 425 U.S. 536, 542 (1976).  "A defendant whose claim is rejected in state court for failure to comply with a state procedural rule may be precluded from raising that claim on habeas review in federal court." Petronio v. Walsh, 736 F. Supp. 2d 640, 652 (E.D.N.Y. 2010) (citing Coleman v. Thompson, 501 U.S. at 729-30; Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999)).  Thus, even if a petitioner raises a colorable federal claim, habeas review is barred if the claim was rejected in the state court on a procedural ground that is both "'independent' of the merits of the federal claim" and provides an "'adequate' basis

for the court's decision." Id. (quoting Fernandez v. Smith, 558 F. Supp. 2d 480, 489 (S.D.N.Y. 2008)).

Here, the state court found that certain of petitioner's claims were procedurally barred because petitioner did not properly comply with the state's procedural rules. Where the state court relied on a procedural default in rejecting petitioner's claim, this Court has examined the merits of the claim regardless, and in each instance found the claims not only procedurally barred but also without merit. (See discussion infra).

VI.    Petitioner's Claims

A. Ground One – The Sandoval Hearing

Petitioner's first claim is that the trial court's ruling in the Sandoval hearing on September 10, 2012 violated his 14th Amendment due process right to a fair trial. (Pet. at 6). Petitioner argues that in allowing the prosecution to elicit the specific underlying facts of Petitioner's previous conviction if he took the stand, the trial court judge incorrectly weighed the probative value of establishing petitioner's credibility against its prejudicial effect. (Pet. at 4-6). The possible introduction of information regarding his prior conviction had a discouraging effect on petitioner taking the stand on his own behalf, "thereby denying this petitioner his due process right to a fair trial." (Pet. at 6). Petitioner did not testify at trial. (See Tr.).

Petitioner raised this claim on direct appeal, and the Appellate Division found that the issue was only partially preserved for appellate review and "in any event, is without merit." People v. Abuziyad, 136 A.D.3d 837, 24 N.Y.S.3d 517. Petitioner has not demonstrated that the state court's decision on this issue was an unreasonable application of clearly established federal law.

In People v. Sandoval, the Court of Appeals of New York held that the trial court may "make an advance ruling as to the use by the prosecutor of prior convictions or proof of the prior commission of specific criminal, vicious or immoral acts for the purpose of impeaching a defendant's credibility." 34 N.Y.2d at 374, 314 N.E.2d 413. The court instructed trial judges to weigh the probative worth of evidence of prior criminal acts with the "risk of unfair prejudice to the defendant, measured both by the impact of such evidence if it is admitted after his testimony and by the effect its probable introduction may have in discouraging him from taking the stand on his own behalf." Id. at 375. The Court of Appeals specifically noted that crimes which reveal "a willingness or disposition on the part of the particular defendant voluntarily to place the advancement of his individual self-interest ahead of principle or of the interests of society, proof thereof may be relevant to suggest his readiness to do so again on the witness stand." Id. at 377. The court specifically noted that "crimes or acts of individual dishonesty, or untrustworthiness," including theft, "will usually have a very material relevance, whenever committed." Id. In the instant case, petitioner's previous conviction was criminal possession of stolen goods in the third degree.

As petitioner's claim regards a state-law question, it is important to emphasize that in conducting a habeas review, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 112 U.S. 50, 67-68 (1991). Meeting the required bar is made only more difficult by the absence of a Supreme Court ruling on whether the use of such evidence could give rise to a constitutional violation. See id. at 75 n.5 (stating "[b]ecause we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of prior crimes evidence to show propensity to commit a charged crime"). Further, AEDPA requires the Court to give

29

deference to state courts on the issue of evidentiary rulings. Green v. Kirkpatrick, No. 17 CV 1997, 2018 WL 3059996, at *12 (S.D.N.Y. Mar. 6, 2018).

Here, there is no basis on which the Court could find that the trial judge's ruling was contrary to or involved an unreasonable application of clearly established federal law. 18 U.S.C. § 2254(d)(1). The trial court's ruling that the prosecution could question petitioner about his prior conviction for criminal possession of stolen property, if he took the stand, aligns with how other courts in the Eastern and Southern Districts of New York have decided this issue. See, e.g., Lewis v. New York State, No. 14 CV 03906, 2017 WL 5591624, at *8 (E.D.N.Y. Nov. 17, 2017) (holding that "the trial court was well within its discretion in determining that evidence of [petitioner's] prior theft and larceny was relevant, and such evidence appears to fall within the line of New York decisions that allow introduction of prior theft-related crimes as highly relevant to the issue of credibility because they demonstrate the defendant's willingness to deliberately further his [or her] self-interest at the expense of society") (internal citations and quotations omitted); see also Sunter v. Captra, No. 13 CV 1551, 2016 WL 836346, at *7 (S.D.N.Y. Feb. 29, 2016); Dixon v. McGinnis, No. 06 CV 39, 2010 WL 3260459, at *13 (S.D.N.Y. June 9, 2010).

Accordingly, because petitioner has failed to show that the state court decision was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts, it is respectfully recommended that petitioner's habeas claim based on the Sandoval ruling be denied.

B. Ground Two – Violation of Confrontation Clause

Petitioner's second claim in his habeas petition is that his right to confrontation was violated when the trial court admitted testimony from OCME employee Kristen Smith. (Pet. at

6). Smith, the only OCME employee who testified, analyzed two DNA profiles produced from the raw data, compared the results, and wrote the two DNA reports establishing that petitioner's DNA matched the DNA found on ski mask 1A. (Tr. at 254). Petitioner argues that he has a right to question the OCME employees who extracted the DNA, duplicated it, and compiled the two DNA profile reports, as this type of data ought to be categorized as testimonial evidence. (Pet. at 10-12, 19-21).

Petitioner raised this claim on direct appeal, and the Appellate Division found that the issue was unpreserved for review because there was no objection to Ms. Smith's testimony at trial, and because the claim was without merit. The court held that the two DNA profile reports were not testimonial evidence "because they consisted of merely raw data that, standing alone, did not link the defendant to the crime." People v. Abuziyad, 136 A.D.3d 837, 24 N.Y.S.3d 517 (internal citations and quotations omitted). Petitioner has not demonstrated that the state court's decision on this issue was an unreasonable application of clearly established federal law.

The Sixth Amendment of the United States Constitution establishes that a person who has been accused of a crime has the right to confront a witness against him or her in a criminal action. This includes the right to cross-examine the prosecution's witnesses. See U.S. Const. amend. VI (providing that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him"); see also U.S. Const. amend. XIV. However, this right to confrontation is not without exception or restriction. See Smith v. State of Illinois, 390 U.S. 129, 133, 88 S. Ct. 748, 750, 19 L. Ed. 2d 956 (1968) (holding that the trial court may exercise "reasonable judgment in determining when" a subject of cross examination had been exhausted, and the court had a duty to protect witnesses from questions intended to "harass, annoy, or humiliate them").

In the Supreme Court's decision in <u>Williams v. Illinois</u>, regarding testimonial evidence, a plurality of the Court held that the Confrontation Clause was not violated when an expert from a state laboratory relied on a DNA profile produced by an outside laboratory to inform the opinions he gave while testifying.  <u>See Williams v. Illinois</u>, 567 U.S. 50, 57, 132 S. Ct. 2221, 2228, 183 L. Ed. 2d 89 (2012). Courts in the Eastern and Southern Districts of New York have interpreted this decision as allowing analysts to testify using DNA profiles that they did not themselves produce, and permits the trial court to admit these reports into evidence.  <u>See, e.g.,</u> <u>Washington v. Griffin</u>, 876 F.3d 395, 405 (2d Cir. 2017).[14]

In <u>Washington v. Griffin</u>, during petitioner's trial, an expert laboratory analyst testified generally about DNA and about the process used by her lab to develop DNA profiles. 876 F.3d at 400 (2d Cir. 2017).  She further testified that, while she did not personally prepare all of the DNA samples used at trial for testing, she was familiar with every page of the report and analysis produced.  Finally, she indicated that she personally reviewed the raw data resulting from all the DNA sampling to reach her own conclusions in finding that the DNA profiles matched that of the petitioner.  The Circuit Court determined that petitioner's rights under the Confrontation Clause were not abridged, holding:  "[T]he Supreme Court has never held that the Confrontation Clause requires an opportunity to cross examine each lab analyst involved in the process of

---

[14] Although the Court, in reviewing the <u>habeas</u> petition, should look to the Supreme Court precedent at the time of the state court decision, <u>see</u> <u>Contreras v. Artus</u>, 778 F.3d at 110, the decisions after <u>Williams</u> are cited to show that the lower courts since <u>Williams</u> have consistently found no violation of the Confrontation Clause when faced with circumstances similar to those presented here. Indeed, even though the Supreme Court continues to clarify the types of statements which fall within the scope of the Confrontation Clause, <u>see, e.g.,</u> <u>Ohio v. Clark</u>, 576 U.S. ___, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015); <u>Michigan v. Bryant</u>, 562 U.S. 344, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011); <u>Bullcoming v. New Mexico</u>, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009)), the <u>Williams</u> case continues to state the law applicable to this issue.

generating a DNA profile and comparing it with another … ."

In Thompson v. Besio, the analysts who testified at trial did not personally produce the DNA profiles on which they based their expert opinion. No. 11 CV 2752, 2014 WL 1478851 (E.D.N.Y. Apr. 15, 2014). In admitting their testimony, the court held that "[t]o the extent adverse inferences against [petitioner] could be drawn from the DNA evidence, they could only be drawn from the conclusions offered in open court by live witnesses, subject to cross-examination, not from the underlying DNA profiles themselves." Id.

Similarly, in United States v. Boyd, the prosecution called as a witness the DNA analyst who had only performed the final step of testing. 686 F. Supp. 2d 382, 384 (S.D.N.Y.), aff'd, 401 F. App'x 565 (2d Cir. 2010). The court held that "where the defendant had ample opportunity to confront the Government witness who undertook the final, critical stage of the DNA analysis, and where that witness was personally familiar with each of the prior steps, testified that the analysis included safeguards to verify that errors would not result in a false positive, and demonstrated that the prior steps were essentially mechanical in nature, the Confrontation Clause is satisfied." Id. at 386. See also Watkins v. Artus, No. 08 CV 5891, 2010 WL 5060861, at *14 (S.D.N.Y. July 22, 2010) (allowing the introduction of DNA results as business records through the testimony of an analyst who had not conducted the testing herself, and stating: "[t]he admission of testimonial evidence only violates a defendant's right to confrontation when the evidence is not subject to cross-examination. Dr. Potter served as a witness open to cross-examination and was, in fact, cross-examined by defense counsel on the reliability of the laboratory techniques and analysis employed in testing defendant's DNA") (internal citations omitted).

The OCME analyst who testified for the prosecution at petitioner's trial had completed

the final, crucial step of the DNA analysis process: interpreting the DNA profiles to match petitioner's DNA to the DNA found on the ski mask 1A. (Tr. at 254). She was familiar with the steps other criminalists in her office took in order to prepare the DNA profiles she received, and she explained to the jury what these steps were. (Id. at 258-260). She was available for cross-examination by defense counsel, though he did not make use of this opportunity and chose not to question her at all. (Id. at 270). Thus, in accordance with established Supreme Court precedent at the time of the trial, and other cases since that time within the Second Circuit which continue to apply the same principles, the Court agrees with the holding of the Appellate Division that the testimony of Ms. Smith and the admission of the two DNA profile reports into evidence did not violate petitioner's right to confront the witnesses against him.

Since petitioner has failed to present any basis on which the Court could find that the state court's decision was contrary to or an unreasonable application of clearly established federal law, the Court respectfully recommends that petitioner's habeas claim based on the DNA profile be denied.[15]

C. Ground Three – Fraudulent Evidence

Petitioner's third claim is that evidence presented at trial was false, and prior to the entry of the judgment, was known to the prosecution to be false, and in violation of petitioner's right to a fair trial. (Pet. at 25; see also Reply ¶ 26). In support of this claim, petitioner cites certain inconsistencies in Grand Jury testimony and in underlying police documents regarding the serial number of Triston Garcia's allegedly stolen laptop. (Pet. at 27-28).

---

[15] Although petitioner argued to the Appellate Division that counsel's failure to challenge the DNA profile reports constituted ineffective assistance of counsel — a claim rejected by the Appellate Court, see People v. Abuziyad, 136 A.D.3d 837, 24 N.Y.S.3d 516 — petitioner has not raised this claim in the current habeas petition.

Petitioner's claim regarding fraudulent evidence was presented to the state court in petitioner's 440.10 motion, filed on November 1, 2012, but was not raised on direct appeal. Thus, this claim is not exhausted.[16]  In reviewing this claim, the state court denied the motion, holding that:  1) defense counsel could have cross-examined the witnesses whose testimony was inconsistent; and 2) there was enough credible evidence for the jury to reach their verdict.  (Tr. at 553).

The Second Circuit has set forth a number of conditions which must be met in order to grant a new trial on the ground that a witness committed perjury.  Petitioner must show that "'(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial.'"  Fernandez v. Capra, 916 F.3d 215, 224 (2d Cir. 2019) (quoting United States v. Cromitie, 727 F.3d 194, 221 (2d Cir. 2013)).  Additionally, petitioner must show that the "facts demonstrating the perjury" could not have been discovered before or during trial with due diligence.  Harris v. United States, 9 F. Supp. 2d 246, 254 (2d Cir. 1998).

Petitioner's claim fails on the merits for two reasons:  1) there is no evidence that the witnesses actually committed perjury; and 2) the facts demonstrating the alleged perjury could have been discovered with the exercise of due diligence.  Petitioner claims that the prosecution's witnesses disseminated fraudulent evidence when they cited different serial numbers while referring to the same black HP laptop.  (Pet. at 27-28.)  Petitioner correctly notes that there was some inconsistency among the witnesses who reported the serial number of Triston Garcia's HP

---

[16] As discussed, supra, the Court will proceed to review the merits of this claim even though it is unexhausted.

laptop. (See Pet., Ex. E[17] ¶¶ 5-8). However, respondent argues that the different answers can be attributed to a simple explanation: some witnesses, when asked for the serial number, unknowingly answered with the laptop's product number or model number, while others misread handwritten notes. (See Pet., Ex. F[18] at 4, 6). For example, in the Grand Jury, Police Officer Michael Scali misread his documents and reported that the serial number of the laptop found was HP598UAABA, instead of the correct serial number, XG598A#ABA. (Id. at 6).

More importantly, in filing the Section 440.0 motion, defense counsel relied on certain paperwork, including information regarding serial numbers, model numbers, and product numbers. There is no dispute that counsel had access to these documents before the trial began, yet counsel chose not to cross-examine any witness who mistakenly cited the product number when asked to provide the serial number. (Pet., Ex. F at 3). Thus, by the exercise of due diligence, this misunderstanding could have been discovered and clarified during trial.

Having reviewed the merits of this claim, the Court finds that petitioner has failed to demonstrate that the prosecution's witnesses gave fraudulent testimony at trial, and it is clear that the evidence necessary to raise the issue was available to counsel at the time of trial. Thus, petitioner has failed to establish the elements of the Second Circuit's test regarding a showing that there was any likelihood that the false testimony could have affected the judgment of the jury. See Fernandez v. Capra, 916 F.3d 224; see also United States v. Agurs, 427 U.S. 97, 103 (1976). Since petitioner has failed to present any basis on which the Court could find that the

---

[17] Citations to "Pet., Ex. E" refer to petitioner's November 1, 2012 motion pursuant to New York Criminal Procedure Law Section 440.10, attached to the Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody, ECF No. 1.

[18] Citations to "Pet., Ex. F" refer to respondent's November 8, 2012 opposition motion pursuant to New York Criminal Procedure Law Section 440.10, attached to the Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody, ECF No. 1.

state court's decision was contrary to or an unreasonable application of clearly established federal law, the Court respectfully recommends that petitioner's third habeas claim be denied.

## CONCLUSION

In light of the above, the Court respectfully recommends that the Petition for a writ of habeas corpus be denied, and the case be dismissed. The Court additionally recommends that since petitioner has not made a substantial showing that his constitutional rights were denied, a certificate of appealability not issue.[19] See 28 U.S.C. § 2253(c)(2). The Court recommends that the district court find pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be in good faith, and therefore, in forma pauperis status be denied for the purpose of an appeal. Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. Section 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Caidor v. Onandaga Cty., 517 F.3d 601, 604 (2d Cir. 2008).

---

[19] To make this substantial showing, petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 475, 120 S. Ct. 1595, 1599, 146 L. Ed. 2d 542 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 & n.4, 103 S. Ct. 3383, 3395, 77 L. Ed. 2d 1090 (1983)).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
September 20, 2019

/s/ Cheryl L. Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York